**Robert M. HAFT, Plaintiff,**

v.

**DART GROUP CORPORATION, Crown Books Corporation and Trak Auto Corporation, Defendants.**

Civ. A. No. 93–384.

United States District Court,
D. Delaware.

Dec. 30, 1993.

Lawrence C. Ashby of Ashby & Geddes, Wilmington, DE (David J. Hensler, Lisa Bonanno, and Jonathan A. Constine of Hogan & Hartson, Washington, DC, of counsel), for plaintiff.

Edward M. McNally, Lewis H. Lazarus, and Joseph C. Schoell of Morris, James, Hitchens & Williams, Wilmington, DE (Michael R. Klein, David M. Becker, Mary C. Manemann, Christopher P. Howard, and Bruce L. Plotkin of Wilmer, Cutler & Pickering, Washington, DC, of counsel), for defendants.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

This case arises out of various disputes among members of the family which controls a parent holding company, Dart Group Corporation ["Dart"], and several majority owned subsidiaries, including Crown Books Corporation ["Crown"] and Trak Auto Corporation ["Trak"]. This Court has subject matter jurisdiction by virtue of diversity of citizenship. 28 U.S.C. § 1332(a)(1) (1988).

In his amended complaint, Robert M. Haft ["plaintiff"] has asserted nine claims against Dart, Crown, and Trak ["defendants"], and defendants have responded by asserting nine affirmative defenses and seven counterclaims.[1] Docket Items ["D.I."] 7, 13. This

---

1. Defendants have labelled counterclaims which range from "Count I" to "Count VI," but have labelled two different counterclaims "Count IV."

opinion addresses plaintiff's motion for partial summary judgment. D.I. 9. Originally, plaintiff moved for partial summary judgment with respect to four of his nine claims, but three have subsequently become moot.[2] The only issue remaining, therefore, is whether plaintiff is entitled to summary judgment on his claim against Crown ["defendant"][3] for breach of an Incentive Stock Agreement [the "agreement"].

Plaintiff currently holds certain shares subject to a restriction upon their transfer. Under the agreement, defendant enjoys the right to repurchase plaintiff's shares if plaintiff "voluntarily terminates employment" with defendant. D.I. 11 Exhibit ["Ex."] C at 2; D.I. 15 Ex. 1–C at 2.[4] Defendant's right to repurchase those shares lapses, however, "upon the termination of [plaintiff's] employment by [defendant] for any reason other than" plaintiff's conviction of a felony involving moral turpitude and directly involving defendant. The agreement further provides that upon the lapse of defendant's repurchase rights, plaintiff is entitled to the issuance of new shares unburdened by any restriction upon their transfer. *Id.* at 4.

The parties make the following arguments: Plaintiff contends he is entitled to new, unrestricted shares because he was fired by defendant on or around June 30, 1993. D.I. 10 at 23. Defendant, by contrast, maintains its right to repurchase those shares has vested because plaintiff "voluntarily terminated" his employment either when he hired Glenn Hemmerle ["Hemmerle"] to replace him as President and Chief Executive Officer on or around September 15, 1992, or when Hemmerle assumed that position on or around October 26, 1992. D.I. 14 at 19–23. In the alternative, defendant claims plaintiff "voluntarily terminated" any employment he may have had through abandonment, that is, by taking actions which were incompatible with the terms of his employment during the months preceding June 30, 1993. D.I. 14 at 23–27. Defendant also asserts two affirmative defenses: first, plaintiff's shares are voidable because they were issued for invalid consideration; and second, plaintiff is not entitled to specific performance of the agreement because he comes before a court of equity with "unclean hands." D.I. 14 at 28–31.

For the reasons which follow, plaintiff's motion for partial summary judgment will be granted in part and denied in part. Summary judgment will be denied as to: (1) plaintiff's claim of entitlement to the issuance of unrestricted shares; and (2) defendant's affirmative defense of "unclean hands." Summary judgment will be granted plaintiff as to defendant's affirmative defense of lack of consideration. That is, as a matter of law, defendant issued the disputed shares to plaintiff for valid consideration.

## II. FACTUAL BACKGROUND

### A. The Early Relationship Between Robert Haft and Crown[5]

Dart is a publicly traded corporation, organized under the laws of the State of Delaware, which is engaged in the business of operating retail discount stores throughout the area surrounding Washington, D.C. D.I. 11 at ¶ 2. During all relevant events, Herbert H. Haft ["Herbert Haft"] was not only its Chairman and Chief Executive Officer, but also its majority shareholder, holding 57% of Dart's stock. Dart in turn is the

---

See D.I. 13 at 39–40. The total is therefore seven.

2. As to those three claims, defendants notified plaintiff they would comply with his requests. D.I. 15 Exhibit ["Ex."] 1–A.

3. The answering brief in opposition to plaintiff's motion for partial summary judgment has been advanced by all three defendants. *See* D.I. 14. The one remaining claim in this motion, however, is asserted against one defendant: Crown.

4. The record contains two versions of the agreement, but both parties have acknowledged there is no material difference between them. *See* D.I. 14 at 4 n. 3 (defendant's answering brief); D.I. 32 at 44 (transcript of hearing on motion for partial summary judgment). For ease of reference, the Court will cite to the signed version of the agreement. *See* D.I. 15 Ex. 1–C.

5. Wording of the subheadings in this section should not be viewed as any resolution of factual issues. The Court has selected these headings merely to provide an organized, chronological framework for the reader.

majority shareholder of Crown, a subsidiary of Dart which owns and operates a chain of retail bookstores. Herbert Haft by virtue of his majority holding in Dart effectively controls Crown. D.I. 15 Ex. 2 at ¶ 1; D.I. 32 at 6. *Id.;* D.I. 7 at ¶¶ 18, 29. Plaintiff, Robert M. Haft ["Robert Haft"], is the son of Herbert Haft. D.I. 15 Ex. 2 at ¶ 2.

In September of 1977, Robert Haft states he joined Dart as its Vice President of Corporate Planning and Development, shortly thereafter founding Crown as a subsidiary of Dart. D.I. 11 at ¶¶ 3–4. Robert Haft describes Crown as a "highly successful chain of retail discount bookstores." *Id.* at ¶ 4. Defendant counters that Robert Haft joined Crown in 1978, "when it was founded by Dart." D.I. 14 at 3.

According to Robert Haft, he served both as Crown's principal executive officer and one of Crown's directors from its creation until June 30, 1993. D.I. 11 at ¶ 5. Defendant differs, asserting Robert Haft served as Crown's principal executive officer only until Robert Haft hired Hemmerle to replace him in that position. D.I. 14 at 19–23. Hemmerle was hired on September 15, 1992 and states he assumed his new position on or around October 26, 1992. D.I. 15 Ex. 1–G, Ex. 3 at ¶ 5.

On February 28, 1987, Robert Haft and Crown entered into an Employment Agreement whereby Crown employed Robert Haft as President and Chief Executive Officer of Crown for a ten-year renewable period. D.I. 15 Ex. 1–B. The Employment Agreement required Robert Haft to "render such services to [Crown] as are customarily rendered by either the President or Chief Executive Officer of comparable publicly held companies and as are required by the General Corporation Law of the State of Delaware." *Id.* at 2.

On June 7, 1989, Crown's Board of Directors authorized the issuance of 100,000 shares of Crown common stock to Robert Haft at a price of $2,0375 per share. D.I. 11 at ¶ 26. That action was implemented on August 30, 1989, when Robert Haft and Crown entered into an Incentive Stock Agreement involving the purchase by Robert

Haft of 100,000 shares of Crown common stock for $203,750.[6] D.I. 11 at ¶ 10; D.I. 15 Ex. 1–C. The agreement acknowledged "payment by [Robert] Haft of the sum of $203,750, in the form of an unsecured, non-interest bearing promissory note due January 2, 2004 (the 'Note'), in full payment of the Shares." D.I. 11 at ¶¶ 26, 27, Ex. O; D.I. 15 Ex. 1–C at 1–2.

The Incentive Stock Agreement also provided that Crown would have the right to repurchase some or all of the shares issued under that agreement if, prior to January 2, 2001, "(i) [Robert] Haft voluntarily terminates employment with [Crown] or (ii) [Crown] terminates [Robert] Haft's employment with [Crown] for 'good cause,' " which is defined as the conviction of a felony directly involving Crown and involving moral turpitude on the part of Robert Haft. D.I. 11 at ¶ 28; D.I. 15 Ex. 1–C at 2. Robert Haft has never been convicted of a felony. D.I. 11 at ¶ 28.

At some time following the execution of the Incentive Stock Agreement, Crown issued and delivered Stock Certificate No. 5464 to Robert Haft, which represents 100,000 shares of Crown common stock. *Id.* at ¶ 30. That certificate also contains an endorsement pertaining to transfer restrictions as set forth in the agreement. *Id.;* D.I. 11 Ex. P.

## B. The Relationship Between Glenn Hemmerle and Crown

Hemmerle, now the President and Chief Executive Officer of Crown, maintains the search firm of Heidrick & Struggles made an unsolicited call to him in the fall of 1991. That call related to the possibility he might assume the position he currently holds. D.I. 15 Ex. 3 at ¶¶ 1–2. At the time, Hemmerle states he was employed as President and Chief Executive Officer of The Athlete's Foot Group, Inc. *Id.* at ¶ 2. According to Hemmerle, he indicated to the search firm that he would be interested in considering the opportunity. *Id.* Thereafter, Hemmerle states Robert Haft contacted him about the posi-

---

6. Defendant has waived any claim that the Incentive Stock Agreement was not properly ap-proved by the Crown Board of Directors. *See* D.I. 32 at 30–42 (transcript of hearing).

tion, explaining he was looking for someone to replace him because Robert Haft "was leaving Crown to become Chief Executive Officer of Dart Group Corporation ... the parent company of Crown." *Id.* at ¶ 3. Herbert Haft was then, and is now, the Chief Executive Officer of Dart. *Id.* at ¶ 3; D.I. 15 Ex. 2 at ¶ 1.

According to Hemmerle, Robert Haft actively recruited him to join Crown, contacting him several more times and inviting him to visit the Crown stores in and around Washington, D.C. in December of 1991. D.I. 15 Ex. 3 at ¶ 4. Hemmerle states he accepted, and during the visit spoke at length with Robert Haft about Hemmerle's potential duties and responsibilities at Crown. *Id.* at ¶ 4. Robert Haft allegedly offered Hemmerle the position of President and Chief Executive Officer after several months of similar discussions. *Id.* On September 15, 1992, Robert Haft, acting on behalf of Crown, entered into an Employment Agreement with Hemmerle whereby Hemmerle became President and Chief Executive Officer of Crown. *Id.* at ¶ 5; D.I. 15 Ex. 1–G. Hemmerle maintains he assumed those positions on October 26, 1992. D.I. 15 Ex. 3 at ¶ 5.

From the very beginning, Hemmerle claims he made it clear to Robert Haft that Hemmerle would join Crown only if Robert Haft could assure him that he "would run the business and would report only to Crown's Board of Directors." *Id.* at ¶ 6. Similar language is contained in his Employment Agreement. *Id.;* D.I. 15 Ex. 1–G. According to Hemmerle, he did so because when he was negotiating for his new position, he was "already President and Chief Executive Officer at a larger company [and] was not prepared to accept less control at Crown." D.I. 15 Ex. 3 at ¶ 6. He further states "[i]t is for this reason that I demanded the duties and titles of both President and Chief Executive Officer." *Id.* Hemmerle remembers Robert Haft continuing to assure him he would be "the principal executive at Crown." *Id.*

Upon assuming his new positions, Hemmerle states he "took control of management and operations of Crown, including administration, personnel, store operations, and merchandising," with all executives reporting directly to him. *Id.* at ¶ 7. Hemmerle notes, however, he did consult with Robert Haft initially about these matters, but that consultations diminished over time. *Id.* According to Hemmerle, Robert Haft's main involvement after the change in positions was in lease negotiations on behalf of Crown. *Id.* at ¶ 8. In February or March of 1993, however, Hemmerle states he established and chaired a real estate committee within Crown. *Id.* This committee made decisions regarding leases and store sites, and Hemmerle remembers that on only a few occasions did Robert Haft attend. *Id.* According to Hemmerle, Robert Haft, then Crown's Chairman of the Board of Directors, later reviewed the decisions of the real estate committee. *Id.*

## C. The Changing Relationship Between Robert Haft and Crown

In general, Hemmerle's position is that soon after he joined Crown, "Robert Haft changed his focus from Crown to matters involving the other Dart businesses." *Id.* at ¶ 9. Hemmerle recalls that around that same time, Robert Haft stated he would be assuming the position of Dart's Chairman. *Id.* at ¶ 10. This event never transpired. *Id.* As for Robert Haft's work habits during this time, Hemmerle states Robert Haft "would visit Crown's office irregularly, sometimes visiting once or twice a week and then only for a few hours." *Id.* at ¶ 9.

Sandra J. DeFeo ["DeFeo"], currently an administrative assistant at Dart, has a similar recollection. D.I. 15 Ex. 4 at ¶ 1. From May of 1985 until September of 1992, DeFeo was a secretary supporting Robert Haft and his administrative assistant, Gail M. Jacobs ["Jacobs"], at Crown. *Id.* Over the course of this tenure, DeFeo asserts Robert Haft's attendance at work "became sporadic." *Id.* at ¶ 2. Specifically, according to DeFeo, Robert Haft would come into the offices two to three times per week often followed by absences of a week or more. *Id.* DeFeo also asserts Robert Haft generally did not arrive before 1:30 or 2:00 p.m. *Id.* at ¶ 3. She further remembers that, over time, his work became much more personal in nature. *Id.*

Beth Ann Alegret ["Alegret"], currently an administrative assistant at Dart, was also a secretary supporting Robert Haft and Jacobs at Crown, from November of 1992 until July of 1993. D.I. 15 Ex. 5 at ¶ 1. Alegret has testified to essentially the same facts as those set forth by DeFeo. *See id.* at ¶ 2. Alegret also states that beginning in April of 1993, Robert Haft directed her not to put through calls from Herbert Haft regardless of whether Robert Haft was available for those calls. *Id.* at ¶ 3. Alegret remembers: "Robert Haft directed me to tell Herbert H. Haft that Robert Haft was not in the office and that I did not know how to contact him." *Id.* Alegret further asserts that her duties included maintaining Robert Haft's files, including separate files for office and personal matters. *Id.* at ¶ 4. During May and June of 1993, according to Alegret, Robert Haft and Jacobs directed her to destroy certain personal documents "and a large number of company documents." *Id.* Alegret maintains that "[t]he vast majority of documents destroyed were company documents." *Id.* Similarly, Alegret states Jacobs instructed her to box up files, including company files, and to put them in various cars at Jacobs' direction. *Id.* at ¶ 5. "Over the next several days, I was instructed to remove files filling at least thirty boxes," Alegret recalls, to be stored in various places around Washington, D.C. *Id.* According to Alegret, when she asked why certain ten-year-old company memoranda were being removed, Jacobs told her "this was being done to defend against any inquiries about her and Robert Haft's workload." *Id.* at ¶ 6.

On April 23, 1993, the *Wall Street Journal* published an article entitled "Dart Group Is Emerging From Its Recession–Era Shell: Founder's Son Plans to Expand Retailer's Discount Store Chains." D.I. 15 Ex. 2–A. Robert Haft's comments relating to expansion of the companies were prominently featured in the article, which referred to Robert Haft as "de facto chief executive" of Dart. *Id.* Herbert Haft states that thereafter, in his capacity as Chairman and Chief Executive Officer of Dart, he met with Robert Haft, then Chairman of Crown, instructing him to "cease immediately any and all communications with any and all communications

media and securities analysts with respect to the business or other affairs of Dart or any of its related or affiliated entities, including Crown." D.I. 15 Ex. 2 at ¶ 2. Herbert Haft also remembers instructing Robert Haft to "cease any and all communications with any shareholders, customers, suppliers, or employees of these corporations." *Id.* According to Herbert Haft, he took these actions because Robert Haft's public comments had caused "significant injury to the companies." *Id.* By letter of April 23, 1993, Herbert Haft confirmed these instructions in writing. *Id.* at ¶ 3; D.I. 15 Ex. 2–B. Nonetheless, he asserts that "in disregard of [his] express instructions, Robert Haft, through a public relations firm, continued to comment to the press about the business of Dart, Crown, and the other related entities." D.I. 15 Ex. 2 at ¶ 4.

On May 24, 1993, Crown's Board of Directors authorized an annual shareholders meeting be held in June of 1993, pursuant to Crown's bylaws. *Id.* at ¶ 5; D.I. 15 Ex. 1–M. *See* D.I. 15 Ex. 1–L (bylaws). Defendant asserts that notwithstanding the board's action, Robert Haft refused to call or permit any other officer to call the annual shareholders meeting "in time for it to be held in June of 1993." D.I. 15 Ex. 2 at ¶ 5. Herbert Haft believes "Robert Haft was motivated to protect his position as Crown's Chairman since Dart ... had indicated its intent not to reelect him to the Board at the June meeting." *Id.* According to Herbert Haft, despite his repeated requests, "Robert Haft attempted to postpone indefinitely the annual meeting of shareholders." *Id.* Plaintiff, on the other hand, maintains he refused to call the annual shareholders meeting until wording disputes over the proxy materials had been resolved. D.I. 32 at 22 (transcript of hearing).

By letter dated June 18, 1993, Herbert Haft, in his capacity as Chairman and Chief Executive Officer of Dart, caused Crown to comply with its perceived legal obligations and provide such notification of the annual meeting to the shareholders as is required by law. D.I. 15 Ex. 2 at ¶ 6; D.I. 15 Ex. 2–C. Herbert Haft terms June 18, 1993 "the last day on which Crown could issue a call for a shareholders meeting and file the required

materials with the Securities and Exchange Commission "in time" to meet the deadline imposed by Crown's bylaws. D.I. 15 Ex. 2 at ¶ 6. According to Herbert Haft, "[e]ven after Dart's June 18, 1993 directive to call a meeting of shareholders, Robert Haft blocked the distribution of Crown's proxy materials, which were also a prerequisite for the annual meeting." *Id.* at ¶ 7. Herbert Haft further claims that "[b]ecause, on June 23, 1993, Robert Haft had still not caused Crown to file and mail the proxy materials required for the annual [shareholders] meeting, Dart was forced to remove him as Chairman in order to have the materials distributed and to have a meeting." *Id.* at ¶ 8. Herbert Haft maintains that only after. he removed Robert Haft from his position as Crown's Chairman were the proxy materials distributed to shareholders and the meeting held on June 30, 1993. *Id.* at ¶ 9.

### D. The Conclusion of the Relationship Between Robert Haft and Crown

On June 30, 1993, Herbert Haft sent a letter to Robert Haft which stated: "[h]aving today assumed responsibility as Chairman of the Board of Crown Books Corporation, I have today instructed the appropriate officers of Crown to suspend all payments to you pending a final resolution of a variety of fundamental issues concerning the status of your contracts with the company." D.I. 11 Ex. Q at 1; D.I. 15 Ex. 2–D at 1. Herbert Haft further related his decision to recuse himself from the process of evaluating the various issues. *Id.* One issue concerned whether Robert Haft's contract was "abandoned, breached or otherwise terminated when [he] and the board agreed that Glenn Hemmerle should replace [him] as Chief Executive Officer and President of the company." *Id.* A second concerned whether Robert Haft's "performance during the past several weeks constitute[d] such insubordination and bad faith as to constitute a material breach of [his] obligations under any contract, independent of the impact of Glenn Hemmerle's contract." *Id.* at 2. According to Herbert Haft, that performance included Robert Haft's

> refusal to call the annual meeting, [his] refusal to cause the distribution of proxy

materials required for the annual meeting, [his] efforts to utilize [his] positions at Crown for [his] personal ends, [his] conversion of company property to [his] own use and a wide array of conduct destructive and obstructive of the business objectives of the company.

*Id.*

After summarizing these issues, Herbert Haft issued the following directive: "In the interim, since you are no longer an employee, officer or director of the company, please promptly arrange for the relinquishment of all property and perquisites ... that depend upon your maintaining such status." *Id.* Shortly thereafter, Crown filed a Form 8–K with the Securities and Exchange Commission stating that on or effective June 30, 1993, Robert Haft was removed from all offices held with Crown. D.I. 11 at ¶ 32; D.I. 11 Ex. R.

On August 4, 1993, Herbert Haft sent another letter to Robert Haft, this time stating that "Crown may cancel your ... promissory note relating to the acquisition of 100,000 shares ... and thereby repurchase those shares since you voluntarily terminated your employment in November 1992." D.I. 11 at ¶ 42; D.I. 11 Ex. V. According to plaintiff, however, he never voluntarily terminated his employment. Instead, plaintiff asserts he was employed by Crown until he was terminated on June 30, 1993. D.I. 11 at ¶ 42. As evidence, Robert Haft points to two documents in the record (D.I. 11 at ¶ 43): First, Crown filed its Form 10–K, signed by Herbert Haft, on April 30, 1993 with the Securities and Exchange Commission. D.I. 11 Ex. W. That form states that "Robert M. Haft is employed by the Company as its Chairman of the Board," and goes on to describe the Incentive Stock Agreement. *Id.* at 32–33. Second, Crown released its 1993 Annual Report, which provides that "Robert M. Haft is employed by the Company as its Chairman of the Board" under a "ten-year employment contract." D.I. 11 Ex. X at 25. Both documents indicate that repurchase may take place "in the event that Mr. Haft terminates employment with the Company." D.I. 11 at ¶ 43; D.I. 11 Ex. W at 33; D.I. 11 Ex. X at

25. Plaintiff further highlights a June 2, 1993 letter from Lewis H. Ferguson, III, Esq. ["Ferguson"], Crown's corporate counsel, to Michael R. Klein, Esq. ["Klein"][7] stating the following:

> While I understand your concern that the [Employment Agreement] may have been terminated when [Robert Haft] gave up those titles [President and Chief Executive Officer], I believe that the contrary is, in fact, the case. I was present at the Crown meeting in Wilmington at which the employment of Glenn Hemmerle was discussed, and I have discussed the matter with the outside directors and their counsel. At that meeting, Robert Haft's employment contract was not discussed, but it was stated that Hemmerle insisted on the titles of President and Chief Executive Officer as conditions for coming on board and Robert Haft indicated that he supported that if it facilitated Hemmerle's employment because he believed Hemmerle was a very talented executive. No one on the board, including any member of the Haft family, raised any question about any change in Robert Haft's role as the principal executive of the company or in his contractual arrangements with the company. Certainly, no one at that time contemplated that Robert's relinquishment of those titles would affect either his duties or his contractual rights in any way. It was assumed by everyone that they would remain unchanged. Indeed, since November 1992, he has continued to function as the principal executive officer of the company and to receive the rights and benefits provided under the contract.

D.I. 11 Ex. Y at 1. Ferguson went on to provide a concrete example of these rights and benefits, including the fact Robert Haft continued to be paid his salary and attendant bonuses by Crown. *Id.* See D.I. 15 Ex. 1–K at 4, Ex. 1–W at 32–33, Ex. 1–X at 25. Finally, Ferguson noted that

to clarify matters, the outside directors are prepared to support a modification of the contract to provide for payment to him for services as Chairman of the Board and to make that modification effective retroactively to the time he gave up the titles of President and Chief Executive Officer because of their view that he has never, in fact, ceased to be the principal officer of the Company.

*Id.* at 2.

On August 5, 1993, Robert Haft asked Crown to issue a new, unrestricted certificate representing the shares which he received pursuant to the Incentive Stock Agreement, maintaining his shares are no longer subject to repurchase by Crown. D.I. 11 at ¶ 44; D.I. 11 Ex. AA. Crown, continuing to assert its repurchase rights, has refused to issue a new certificate. D.I. 11 at ¶ 45.

## III. DISCUSSION

### A. Summary Judgment Standard

 Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is deemed "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the litigation under the applicable law. *Id.* In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), the Supreme Court held this language mandates an entry of summary judgment against a party who fails to demonstrate the exis-

---

7. Klein's relationship to these events is in dispute. Klein appears to have given personal counsel to Herbert Haft and served as litigation counsel for defendants. D.I. 32 at 23–25, 78 (transcript of hearing). Plaintiff contends, as well, that Klein has participated in the events leading up to this litigation to such an extent he will be called as a fact witness at trial. *Id.* Despite this contention, it appears Klein intends to serve as trial counsel for defendants. Whether his intentions will be realized depends, of course, on the Court's resolution of plaintiff's pending motion to disqualify him as counsel in this case. *See* D.I. 37.

tence of an element essential to its case on which it will bear the burden of proof at trial.

■ The party who files a motion for summary judgment bears the initial burden of demonstrating the absence of a genuine issue. When that party, the "movant," does not bear the burden of proof at trial, it is under no obligation to support its motion with affidavits or other evidence negating the claim or defense of its opponent. *Id.* at 323, 106 S.Ct. at 2552–53. Instead, "the moving party need only establish that there exists no genuine issue of material fact as to any essential element of the nonmovant's claim or defense." *International Association of Heat & Frost Insulators Local Union 42 v. Absolute Envtl. Servs., Inc.,* 814 F.Supp. 392, 401 (D.Del.1993). The party in opposition to the motion, the "nonmovant," must then "go beyond the pleadings" by supplying certain evidentiary materials such as affidavits. *Id.,* 477 U.S. at 324, 106 S.Ct. at 2553. *See* Fed.R.Civ.P. 56(c) ("depositions, answers to interrogatories, and admissions on file, together with the affidavits"). Using those materials, the nonmovant must establish a genuine issue for trial. Fed.R.Civ.P. 56(e).

■ When the movant does bear the burden of proof at trial, however, "the standard is more stringent." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992). The Third Circuit Court of Appeals has stated that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Id.* *See also Anchorage Assocs. v. Virgin Islands Bd. of Tax Review,* 922 F.2d 168, 175 (3d Cir.1990) (holding that "[w]here the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle

the moving party to judgment as a matter of law").

■ In deciding whether a triable issue of material fact exists, the Court draws all inferences in favor of the nonmovant. In other words, the nonmovant's assertions based on "the underlying facts contained in the evidential sources ... must be taken as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (footnote omitted). In doing so, however, the Court does not resolve any issues of fact which may exist, for "credibility evaluations are inappropriate in deciding a motion for summary judgment." *Country Floors, Inc. v. Gepner,* 930 F.2d 1056, 1061 (3d Cir.1991).

### B. Choice of Law

■ Because the materiality of facts depends on the applicable law, the threshold issue is which law applies to this case. Generally, in federal civil actions for which state law supplies the rule of decision, the federal courts are to apply state law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). As to which state law applies, the issue is to be governed by the law of the forum state—the State of Delaware. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 1020, 85 L.Ed. 1477 (1941). In his motion, plaintiff advances a breach of contract claim, which is governed by state law.[8] In the absence of other facts, then, the "most significant relationship" test for choice of law in contract actions would govern. *See Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del.1991).

■ In this case, however, the parties have made their own choice of law, that is, they have contracted expressly for the Incentive Stock Agreement to be "construed and enforced in accordance with the laws of the

---

8. In fact, plaintiff's claims in this litigation are governed exclusively by state law. In those claims which have not become moot, plaintiff alleges breach of various contracts and also seeks

declaratory judgments as to his rights under the stock incentive agreement, various stock option agreements, and a resolution by the Dart Board

state of Delaware."[9] D.I. 15 Ex. 1–C at 6. Delaware courts generally honor such provisions selected by contracting parties, so long as some material connection links the chosen jurisdiction to the transaction. *Wilmington Trust Co. v. Wilmington Trust Co.*, 24 A.2d 309, 313 (Del.1942); *Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1306 (Del.Super.Ct.1986). *See* Restatement (Second) of Conflict of Laws § 187 (1971). That connection is clearly present here because defendants are all incorporated in Delaware. *See A.I.C., Ltd. v. Mapco Petroleum, Inc.*, 711 F.Supp. 1230, 1237 (D.Del.), *aff'd mem.*, 888 F.2d 1378 (3d Cir.1989) (upholding similar choice of law provision when defendant was incorporated in Delaware). The Court therefore will construe and enforce the Incentive Stock Agreement in accordance with the laws of the State of Delaware.

## C. Plaintiff's Entitlement to the Issuance of Unrestricted Shares

In Count III of his amended complaint, plaintiff alleges that by refusing to issue a new, unrestricted certificate representing his shares, defendant has materially breached the Incentive Stock Agreement. D.I. 7 at 18–19. Defendant maintains the agreement entitles it to repurchase those shares. D.I. 13 at 20. At the heart of the dispute is the meaning of several provisions of the Incentive Stock Agreement. D.I. 15 Ex. 1–C.

The agreement begins with several recitals,[10] which state the agreement is "in recognition of [plaintiff's] contribution to [defendant] and for the purpose of retaining his continued services...." D.I. 15 Ex. 1–C at 1. The recitals further state that "[i]t is intended that the issuance of the Shares to

of Directors. D.I. 7 at 16–26 (first amended complaint).

9. The Employment Agreement contains a virtually identical provision. D.I. 15 Ex. 1–B at ¶ 5.10.

10. The recitals in full provide:
A. On June 7, 1989, the Board of Directors of the Corporation, in recognition of Robert M. Haft's contribution to the Corporation and for the purpose of retaining his continued services to the Corporation, authorized the issuance of 100,000 shares of common stock of the Corporation (the "Shares") to Haft at a price of $2.0375 per share (the "Issue Price").

[plaintiff] serve as an incentive for [his] continued employment by [defendant]." *Id.* In order to realize that intention, the recitals provide for defendant's right to repurchase the incentive shares "in the event [plaintiff's] employment with [defendant] terminates prior to January 2, 2001." *Id.* The recitals conclude by acknowledging "good and valuable consideration." *Id.*

The agreement goes on to provide the following, in relevant part:

1. *Transfer of Shares.* The Corporation hereby transfers and conveys the Shares to Haft, subject to the covenants and restrictions set forth in this Agreement. The Corporation hereby acknowledges payment by Haft of the sum of $203,750, in the form of a non-interest bearing promissory note due January 2, 2004 (the "Note"), in full payment of the Shares.

2. *Repurchase of Shares by the Corporation.*

(a) Except as may be otherwise provided by subparagraph (b) of this Section 2, in the event that prior to January 2, 2001 (i) Haft voluntarily terminates employment with the Corporation or (ii) the Corporation terminates Haft's employment with the Corporation for "good [sic] cause," as defined below, the Corporation shall have the right to repurchase the Shares at the Issue Price.... For the purposes of this Agreement, the Corporation will have "just cause" for termination of Haft's employment in the event Haft is convicted of a felony (after all appeals have expired) directly involving the Corporation and in-

B. It is intended that the issuance of the Shares to Haft serve as an incentive for Haft's continued employment by the Corporation. Accordingly, the Corporation will have the right to repurchase all or a portion of the Shares, as set forth herein, in the event Haft's employment with the Corporation terminates prior to January 2, 2001.
NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:
D.I. 15 Ex. 1–C at 1.

volving moral turpitude on the part of Haft.

(b) Notwithstanding the foregoing, the Corporation's right to repurchase the Shares at the Issue Price shall immediately terminate (i) upon the death or disability of Haft, (ii) upon the termination of Haft's employment by the Corporation for any reason other than for just cause as defined above or (iii) in the event of a Major Business Change of the Corporation ... in which event Haft's right to the Shares shall immediately vest in full subject to no restrictions whatsoever....

3. *Restriction on Transfer.* Haft agrees that he will not sell, assign or otherwise transfer any portion of the Shares which, at the time of such sale, assignment or other transfer, are subject to the Corporation's repurchase right under Section 2 of this Agreement, except (i) to a person who is Haft's wife, sibling, nephew, niece, child or grandchild, (ii) to a trust for the benefit of any of the foregoing persons, and (iii) by will or the laws of descent and distribution. Nothing herein, however, shall be construed to restrict or limit Haft's ability to sell, assign or otherwise transfer any portion of the Shares with respect to which the Corporation's repurchase right has lapsed pursuant to Section 2 of this Agreement.

4. *Stock Certificate Endorsement.* The certificate or certificates representing the Shares issued to Haft shall bear a [restrictive] statement.... The Corporation agrees that at such time and from time to time, as the Corporation's right of repurchase lapses with respect to any portion of the Shares, the Corporation will issue a new certificate or certificates, free of the foregoing statement, in substitution and replacement of the certificate or certificates representing the Shares no longer subject to the Corporation's right of repurchase....

*Id.* at 1–4. Defendant, therefore, is entitled to repurchase plaintiff's shares if either one of two events occurs: first, if plaintiff "voluntarily terminates employment" with defendant; and second, if defendant terminates plaintiff's employment for "just cause," which is defined as the conviction of a felony directly involving defendant and involving moral turpitude on the part of plaintiff. *Id.* at 2. Both parties agree there has been no such conviction. D.I. 10 at 24 (plaintiff's opening brief); D.I. 14 at 4 n. 4 (defendant's answering brief). At issue, then, is whether plaintiff "voluntarily terminate[d] employment" with defendant.

 The rules governing the construction of contracts are well settled. Of course, central to contract law is the notion that the parties are bound by the terms of their agreement. *Harry H. Rosin Co. v. Eksterowicz*, 73 A.2d 648, 651 (Del.Super.Ct.1950). Accordingly, courts are to read the contract as a whole and give its provisions their ordinary meaning. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992). That is, unless a contrary intent plainly appears, "the intent of the parties must be ascertained from the language of the contract." *Id.* Courts should not rewrite the plain language of "an otherwise valid contractual provision," even to supply perceived omissions.[11] *Ed Fine Oldsmobile, Inc. v. Diamond State Tel. Co.*, 494 A.2d 636, 638 (Del.1985); *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del.1969). Nor are courts to make any sort of value judgment about a contract whose meaning is clear. *Ryan v. Weiner*, 610 A.2d 1377, 1380 (Del.Ch. 1992). "In the absence of ambiguity, there is no room for interpretation or a search for the intent of the parties." *Myers v. Myers*, 408 A.2d 279, 280 (Del.1979). *Accord Nepa v. Marta*, 415 A.2d 470, 472 (Del.1980).

 If a contract contains some ambiguity, however, courts may employ rules of construction to consider facts other than the

---

**11.** Of course, courts may supply, using legal principles, necessary terms of a contract which have been omitted merely through inadvertence. *Martin v. Star Publishing Co.*, 126 A.2d 238, 244 (Del.1956). A term should be supplied when "it can be rightfully assumed that it would have been [included] if attention had been directed to it." *Danby v. Osteopathic Hosp. Ass'n*, 101 A.2d 308, 313 (Del.Ch.1953), *aff'd*, 104 A.2d 903 (Del. 1954). A court could imply, for example, a reasonable time for performance. *Martin*, 126 A.2d at 244.

contractual terms themselves.[12] *Du Pont v. Wilmington Trust Co.*, 45 A.2d 510, 517 (Del. Ch.1946). A contract is "ambiguous" only when "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). Ambiguity is not present, however, merely because the parties do not agree on its proper construction. *Id.* Instead, "the true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* The construction of a contract is treated purely as a question of law. *Klair v. Reese*, 531 A.2d 219, 222 (Del.1987). *See* Restatement (Second) of Contracts § 212, cmt. d (1981).

The phrase "voluntarily terminates employment" does possess an ordinary meaning. "Voluntarily" is defined as "in a voluntary manner," or "proceeding from the will," "produced in or by an act of choice," "done by design or intention," and "not constrained, impelled, or influenced by another." Webster's New Int'l Dictionary 2564 (3d ed. 1971). *Cf. Anchor Motor Freight, Inc. v. Unemployment Ins. Appeal Bd.*, 325 A.2d 374, 376 (Del.Super.Ct.1974) (in context of statute awarding unemployment benefits, defining "voluntary" as "proceeding from one's own choice or full consent"). The ordinary meaning of "terminate" is "to bring to an ending in time ... or continuity," "to end formally and definitely," and "to discontinue the employment of." Webster's New Int'l Dictionary 2359 (3d ed. 1971). The dictionary definition of "employment" is singularly unhelpful.[13] The employment relationship, however, traditionally has required a legal definition, one which the cases adequately provide.

Delaware courts consider four elements to determine whether an employment relationship exists:[14] "(1) who hired the employee, (2) who may discharge the employee, (3) who pays the employee's wages, and (4) who has the power to control the conduct of the employee when he is performing the particular job in question."[15] *White v. Gulf Oil Corp.*, 406 A.2d 48, 50–51 (Del.1979) (quoting *Lester C. Newton Trucking Co. v. Neal*, 204 A.2d 393, 394–395 (Del.1964)). *See* Restatement (Second) of Agency § 220 (1958) (listing factors used to determine whether one is acting as a servant of another). Of these four elements, the predominant one is the right to control.[16] *White*, 406 A.2d at 51. Indeed, "[f]rom the existence of the right to control springs the employer-employee relationship." *Newton Trucking*, 204 A.2d at 395. "Employment," then, does have an ordinary, albeit legal meaning, com-

---

**12.** They should do so by attempting to arrive at the common intent of the parties in light of the overall purpose of the contract. *Klair v. Reese*, 531 S.2d 219, 223 (Del.1987); *Playtex FP, Inc. v. Columbia Casualty Co.*, 622 A.2d 1074, 1077 (Del.Super.Ct.1992).

**13.** "Employment" is defined as "work paid for by an employer." Webster's New Int'l Dictionary 743 (3d ed. 1971). Just as circular is the definition of "employee": "one employed by another usu[ally] in a position below the executive level and usu[ally] for wages." *Id.*

**14.** For the most part, the cases have addressed the question whether an employer was liable for the tortious acts of one claimed to be its employee. There is no indication, however, that a standard containing different elements governs the contractual side of the employment relationship. *See Lester C. Newton Trucking Co. v. Neal*, 204 A.2d 393, 395 (Del.1964) ("[w]e think the nature of the action does not change the general principles governing this question").

**15.** The Delaware Supreme Court has held that the question whether an employment relationship exists under the Delaware Workmen's Compensation Acts "is governed by the same tests applied by the general law." *Loden v. Getty Oil Co.*, 316 A.2d 214, 216 (Del.Super.Ct.1974) (citing *Lester C. Newton Trucking Co. v. Neal*, 204 A.2d 393 (Del.1964)). The statutory definition of "employee" is thus instructive. The acts define "employee" as "every person in service of any corporation [private or public], ... under any contract of hire, express or implied, oral or written, or performing services for a valuable consideration, ... and excluding any person whose employment is casual and not in the regular course of the trade, business, profession or occupation of his employer...." Del.Code tit. 19 § 2301(9) (1985).

**16.** "It is not necessarily the exercise of control or interference by the employer, but the existence of the right of control or to interfere, which renders one an employee...." *Gooden v. Mitchell*, 21 A.2d 197, 201 (Del.Super.Ct.1941).

pleting the definition of the phrase "voluntarily terminates employment" as "intentionally brings to an end, formally and definitely, by design and by an act of choice, a position of employment" as that concept is defined by the cases.

This definition fits well within the context of the agreement as a whole. Section 1 of the Incentive Stock Agreement transfers ownership of 100,000 shares to plaintiff and acknowledges his payment of $203,750 in return. D.I. 15 Ex. 1–C at 1–2. Section 2 provides for defendant's repurchase of those shares in the event plaintiff chooses not to remain an employee.[17] *Id.* at 2. That section also states that defendant's repurchase rights will terminate: first, if plaintiff dies or is disabled; second, if defendant fires plaintiff for any reason other than his conviction of a felony directly involving defendant and involving moral turpitude on the part of plaintiff; and third, if defendant undergoes a major business change. *Id.* at 2–3. Section 3 partially restricts plaintiff's right to transfer his shares for so long as defendant's repurchase rights attach. Conversely, plaintiff may transfer his shares to whomever he wishes upon the termination of defendant's repurchase rights. *Id.* at 3–4. Section 4 provides for a restriction on the certificate evidencing plaintiff's shares for so long as defendant's repurchase rights attach. When those repurchase rights terminate, that section also entitles plaintiff to a new certificate free of any restrictions. *Id.* at 4. The only fair interpretation of these provisions, taken as a whole, is that the parties meant to use the shares to provide an incentive for plaintiff to remain employed by defendant. *See id.* at 1 ("[i]t is intended that the issuance of the Shares to Haft serve as an incentive for Haft's continued employment by the Corporation"). Thus, because these provisions are fairly susceptible of one and only one interpretation, the agreement containing them is

not ambiguous. As such, the agreement does not support "a search for the intent of the parties." *Myers v. Myers,* 408 A.2d 279, 280 (Del.1979).

Defendant urges the term "employment," as it appears in the Incentive Stock Agreement, is so ambiguous as to require clarification using the terms of the Employment Agreement. D.I. 14 at 18–27. There are three problems with this approach: first, as discussed, the term "employment" is fairly susceptible to only one interpretation under the case law; second, the Incentive Stock Agreement makes no reference to the Employment Agreement;[18] and third, imposing the terms of the Employment Agreement upon the terms of the Incentive Stock Agreement may have the effect of transforming an agreement whose provisions are plain into one whose provisions conflict. The Incentive Stock Agreement, for example, includes only two events triggering defendant's right to repurchase plaintiff's shares: if "(i) Haft voluntarily terminates employment with the Corporation or (ii) the Corporation terminates Haft's employment with the Corporation for 'good cause'. . . ." D.I. 15 Ex. 1–C at 2. Defendant, at oral argument, urged that a breach by plaintiff of the Employment Agreement may constitute voluntary termination for the purposes of the Incentive Stock Agreement. D.I. 32 at 70–72. Such a construction, however, would add a new and different "triggering event" to the plain language of the agreement.[19]

The Court therefore holds the Incentive Stock Agreement is free from ambiguity, not requiring any "clarification" by reference to the Employment Agreement. There remains the task of determining whether a genuine issue of fact is present with respect to whether plaintiff "voluntarily terminate[d] employment" with defendant. Plaintiff contends he

---

**17.** That section, of course, also provides for repurchase in the somewhat more unlikely event plaintiff is convicted of a felony directly involving defendant and involving moral turpitude on the part of plaintiff. *Id.* at 2. This event, having failed to occur, is not at issue.

**18.** This is true despite the fact that the parties signed the Employment Agreement on February

28, 1987, approximately eighteen months before they signed the Incentive Stock Agreement on August 30, 1989. *See* D.I. 15 Exs. 1–B (Employment Agreement), 1–C (Incentive Stock Agreement).

**19.** The Court discusses separately the question whether plaintiff abandoned his employment. *See infra* at 572.

was fired, while defendant asserts plaintiff voluntarily terminated his employment. There are four possible capacities in which plaintiff could have been an employee of defendant as of June 30, 1993, the date plaintiff alleges he was fired and well after the date defendant alleges plaintiff voluntarily relinquished his employment: (1) as President and Chief Executive Officer under the Employment Agreement; (2) as Chairman of the Board under a modified Employment Agreement;[20] (3) as Chairman of the Board under no formal employment agreement, but by virtue of his activities in furtherance of an employment relationship with defendant; and (4) as Chairman of the Board solely by virtue of his position as an officer of defendant.[21] The Court will consider each capacity in turn. The Court then will consider the possibility plaintiff abandoned any employment relationship, in whatever capacity, he may have had with defendant.

### 1. Employment Under the Employment Agreement

The Employment Agreement provides, in part, that defendant

> hereby employs R.M. Haft and R.M. Haft hereby accepts employment as the President and Chief Executive Officer of the Corporation for a term that shall continue.... unless either party shall have notified the other in writing that the term of this Employment Agreement shall not be further extended.... R.M. Haft will render such services to the Corporation as are customarily rendered by either the President or Chief Executive Officer of comparable publicly held companies and as re-

quired by the General Corporation Law of the State of Delaware....

D.I. 15 Ex. 1–B at 1–2. The Employment Agreement thus directly speaks to plaintiff's title and duties. Both parties agree, however, that by hiring Hemmerle as President and Chief Executive Officer, plaintiff was no longer employed as President and Chief Executive Officer. That is, defendant did not employ two men bearing the same corporate title. D.I. 32 at 10 (plaintiff's acknowledgement), 60 (defendant's acknowledgement). The issue thus becomes whether plaintiff's continued activities as Chairman of the Board[22] were encompassed by the terms of an Employment Agreement which would have to be deemed modified at least as to his title.

The Delaware Supreme Court has held that a written contract may be modified by agreements which themselves are not formally written. *Pepsi–Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del.1972) (finding acquiescence in the face of price increases beyond the written contractual term to constitute valid modification of the contract). For example, the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary.[23] *Id.* See also *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del.Super.Ct.1979) (holding "[t]he general rule is that a written contract may be modified by subsequent oral agreement").

No modification is possible without "all the requisite[s] of a valid and enforceable agreement," including the consent of both parties and consideration.[24] *Drake v.*

---

**20.** The parties have never framed their argument precisely in these terms, but they raise the issue by discussing what defendant's board of directors understood about the continued vitality of plaintiff's employment contract.

**21.** The parties raised this argument during the hearing on the present motion. They then submitted letters containing points of authority pursuant to Local Rule 7.1.1(b).

**22.** The parties have introduced no evidence suggesting that Robert Haft succeeded another person as Chairman of the Board.

**23.** A "prohibition against amendment except by written change may be waived or modified in the

same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties." *Id.*

**24.** If only one party intends a modification to the contract, the other party may take one of two courses: first, rescind the contract without delay; or second, consent to the modification. *Wolf v. Globe Liquor Co.*, 96 A.2d 236, 240 (Del.Ch. 1953), *aff'd*, 103 A.2d 774 (Del.1954). Failure to adopt the former course will likely be deemed an adoption of the latter. In one example, the Delaware Chancery Court held the plaintiff, after accepting lesser payments under a contract for

*Hercules Powder Co.*, 55 A.2d 630, 636 (Del.Super.Ct.1946). *Accord De Cecchis v. Evers*, 174 A.2d 463, 464 (Del.Super.Ct.1961). Further, even if those requisites are present, the new contract must be of such specificity "as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." *Reeder*, 397 A.2d at 141.

 After a valid modification, the new contract does not destroy the old. As the Delaware Chancery Court stated, "[a] new contract ... does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely." *Lee Builders v. Wells*, 92 A.2d 710, 715 (Del.Ch. 1952), *rev'd on other grounds*, 99 A.2d 620 (Del.1953). Of course, the new contract must relate to the subject matter of the former contract. *Id.* Whether the parties to a contract intended a new contract to supersede an old one, whether partially or entirely, depends on their intent. *Drake*, 55 A.2d at 636. As a consequence, the question is one of fact. *Lee Builders*, 92 A.2d at 715. *Accord Empire Box Corp. v. Jefferson Island Salt Mining Co.*, 36 A.2d 40, 43 (Del.1944).

 In this case, Robert Haft entered into an Employment Agreement specifying a certain title: President and Chief Executive Officer. D.I. 15 Ex. 1–B at 1. After relinquishing that title, Robert Haft did continue to be paid his salary and attendant bonuses by Crown, as Ferguson noted in a letter to Klein. *See* D.I. 11 Ex. Y at 1; D.I. 15 Ex. 1–K at 4, Ex. 1–W at 32–33, Ex. 1–X at 25. Ferguson, acting as corporate counsel to defendant, additionally stated that

> to clarify matters, the outside directors are prepared to support a modification of the contract to provide for payment to him for services as Chairman of the Board and to make that modification effective retroactively to the time he gave up the titles of President and Chief Executive Officer because of their view that he has never, in

fact, ceased to be the principal officer of the Company.

D.I. 11 Ex. Y at 2. Defendant, however, alleges certain other material facts which establish a genuine issue: First, according to Hemmerle, Robert Haft said he needed a replacement because he "was leaving Crown to become Chief Executive Officer of Dart Group Corporation ..." D.I. 15 Ex. 3 at ¶ 3. After being heavily recruited, Hemmerle signed an Employment Agreement with Crown whereby Hemmerle became the new President and Chief Executive Officer. *Id.* at ¶ 5; D.I. 15 Ex. 1–G. Around that time period, Hemmerle remembers Robert Haft continuing to assure him he would be "the principal executive at Crown." D.I. 15 Ex. 3 at ¶ 6. Hemmerle further states that while he took over immediately, "Robert Haft changed his focus from Crown to matters involving the other Dart businesses." *Id.* at ¶ 9.

The Court must make all inferences in favor of defendant. Doing so, the Court holds a factfinder could infer from these facts that: (1) Robert Haft had shifted his attentions from being the top executive at Crown to being the top executive at Dart; and (2) knowing this, the Crown Board of Directors intended that Robert Haft give up not only his title, but also the employment that accompanied his title. Thus, a genuine issue of material fact exists as to whether the parties intended for Robert Haft to continue to be employed by Crown as its principal executive officer—using the title of Chairman—under an Employment Agreement which was modified upon the hiring of Hemmerle as President and Chief Executive Officer. Summary judgment must be denied plaintiff on this issue.

### 2. Other Employment

 As previously discussed, Delaware courts consider four elements to determine whether an employment relationship exists: "(1) who hired the employee, (2) who may discharge the employee, (3) who pays the employee's wages, and (4) who has the power to control the conduct of the employee

---

"several years," could not "now claim his other remedy of repudiating the contract, since that remedy is inconsistent with performance of the

contract." *Id.* (citations omitted). In effect, plaintiff had consented to the modification through his inaction.

when he is performing the particular job in question." *White v. Gulf Oil Corp.,* 406 A.2d 48, 50–51 (Del.1979) (quoting *Lester C. Newton Trucking Co. v. Neal,* 204 A.2d 393, 394–395 (Del.1964)). These elements are to be weighed in light of the circumstances of each case. *Id.* Thus, because "[e]ach particular case must, out of necessity, depend on its own facts, and ordinarily no one characteristic of the relation is decisive.... [a]ll of the characteristics must be considered [and] [c]onsequently, in a majority of the cases the question becomes one of fact." *Gooden v. Mitchell,* 21 A.2d 197, 201 (Del.Super.Ct.1941).

■■■ Crown originally hired Robert Haft (D.I. 15 Ex. 1–B), and continued to pay him throughout the time period in dispute. D.I. 11 Ex. Y at 1; D.I. 15 Ex. 1–K at 4, Ex. 1–W at 32–33, Ex. 1–X at 25. There are other material facts, however, which demonstrate a genuine issue. Upon assuming his new positions, Hemmerle stated, he "took control of management and operations of Crown, including administration, personnel, store operations, and merchandising," with all executives reporting to him. D.I. 15 Ex. 3 at ¶ 7. Robert Haft, however, did not report to Hemmerle. *Id.* In fact, in at least one discrete area, the opposite may be true. According to Hemmerle, Robert Haft did continue to review decisions of the real estate committee of which Hemmerle was Chairman. Drawing all inferences in favor of defendant, the Court holds a factfinder could infer that Robert Haft was not under the control of any officer at Crown and therefore arguably was not employed by Crown. There is a genuine issue of material fact present in the summary judgment record. A grant of summary judgment to plaintiff would be improper.

■■■ Plaintiff argues, however, that notwithstanding these factual elements, he, as Chairman of the Board, was automatically an employee of defendant. D.I. 32 at 76–77. He reasons the bylaws provide that "[t]he Chairman of the Board ... shall be an officer of the Corporation" and therefore as an officer he was an employee of Crown. D.I. 15 Ex. 1–L at 10. Being a corporate director does not make one a corporate employee.

*Wharton v. Fidelity–Baltimore Nat'l Bank,* 222 Md. 177, 158 A.2d 887, 891 (1960). *See also* 18B Am.Jur.2d *Corporations* § 1346 (1991); 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 (perm. ed. rev. vol. 1990) ("a director of a corporation may or may not be an employee of the corporation [but].... [a] director of a corporation is not, merely by virtue of his position, its employee"). The question then becomes whether being a corporate officer leads to a different result.

Defendant's bylaws themselves are instructive. They provide that "[t]he Chairman of the Board (if the Board of Directors so deems advisable and selects one) shall be an officer of the Corporation and, subject to the direction of the Board of Directors, shall perform such executive, supervisory and management functions and duties as from time to time may be assigned to him or her by the Board." D.I. 15 Ex. 1–L at 10. The bylaws further state that "[t]he election or appointment of any officer of the Corporation in itself shall not create contract rights for any such officer." *Id.* at 9. Thus, under the bylaws, Robert Haft was an officer of Crown by reason of being Chairman of the Board. Under the same bylaws, however, without more, Robert Haft had no contract rights merely by holding the office of Chairman of the Board.

■■■ The Delaware Supreme Court has not provided direct guidance as to whether corporate officers are automatically corporate employees as well. Therefore, the Court must predict how the Delaware Supreme Court would resolve this issue were it called upon to do so. *Wiley v. State Farm Fire & Cas. Co.,* 995 F.2d 457, 459 (3d Cir. 1993). "Although some have characterized this assignment as speculative ... nonetheless it is a task which [the Court] may not decline." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661–62 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). In carrying out this chore, the Court may consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would

decide the issue at hand." *Id.* at 663 (citations omitted).

In *Goldman v. Shahmoon,* 208 A.2d 492, 493 (Del.Ch.1965), the Delaware Chancery Court noted "there appears to be a historically rigid view of the attributes which set a corporate officer apart from an employee." At any rate, that court said, "[i]t is clear that the terms officers and agents are by no means interchangeable." *Id.* at 494. Significantly, the two relationships arise from different manners of creation in that "[o]fficers as such are the corporation. An agent is an employee." *Id.* The manner of creating these relationships also affects the manner in which they can be terminated. Officers may be discharged by the corporation, but employees may only be discharged according to the terms of their employment. *Id. See Stellini v. Oratorio,* No. 5780, 1979 WL 2703, at *3 (Del.Ch. Sept. 5, 1979) (holding plaintiffs "continued as directors and officers of the corporation at the pleasure of the majority stockholders" because there was no evidence plaintiffs "had any sort of employment agreement").

Further, in one analogous decision relating to the public sector, the Delaware Superior Court held that state board members, "unless provided for otherwise by legislation, are not employees in the usual sense of the word.... Historically they have been regarded as public officers and not public employees." *Wharton v. Everett,* 229 A.2d 492, 494 (Del.Super.Ct.1967). The court went on to say that because " '[i]t is sometimes difficult to determine whether a position is an office or a mere employment,' " it relied upon the following test: "Generally speaking, ... a state office embraces the right to exercise a state function ... and to take the fees and emoluments belonging thereto. It not only involves the conception of tenure, power, duration, oath, fees and emoluments but also

the authority and duty to exercise some part of the sovereign power of the state...." *Id.* (quoting *Biggs v. Corley,* 172 A. 415, 419 (Del.1934)). The court added that "each case must necessarily depend upon its own facts." *Id.*

Based upon these two cases, the Court predicts that the Delaware Supreme Court would differentiate between corporate officers and corporate employees. Basic to the law of corporations is the notion that a corporate office embraces the right to exercise corporate functions. Similarly, a corporate office involves the "conception of tenure, power, duration, oath, fees and emoluments but also the authority and duty to exercise" the power of the corporation. *See generally* 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* (perm. ed. rev. vol. 1990) (relating to directors, officers and agents). Not every corporate employee is possessed of the authority and duty to exercise the powers of the corporation. *See, e.g.,* Del.Code tit. 8 § 142 (1991) (providing for special duties of officers).

The case law of other jurisdictions also is persuasive in the area of corporate employment relationships. *See Lester C. Newton Trucking Co. v. Neal,* 204 A.2d 393, 395 (Del.1964) (citing case based on law of Maryland); *Goldman v. Shahmoon,* 208 A.2d 492, 494 (Del.Ch.1965) (citing case based on law of Georgia). Those and other jurisdictions subscribe to the view that whether corporate officers are also corporate employees depends on the facts of the particular case. In *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 141 A. 434, 438 (1928), for example, the court held that "[neither] a director nor any other officer of a corporation is by virtue of his office its employee", but an officer could be an employee "where the duties and incidents of his employment are separate and distinct from those pertaining to his office." [25]

---

25. *Accord Garcia v. Watson Tile Works, Inc.,* 111 N.M. 209, 803 P.2d 1114, 1115 (Ct.App.1990); *Commission on Ecumenical Mission v. Roger Gray, Ltd.,* 27 N.Y.2d 457, 318 N.Y.S.2d 726, 267 N.E.2d 467, 469 (1971); *Evans v. General Ins. Co.,* 390 S.W.2d 818, 821 (Tex.Civ.App.1965); *Thibodeaux v. Parks Equip. Co.,* 185 So.2d 232, 243–44 (La.Ct.App.1965); *Connecticut State Bd. of Labor Relations v. Greenwich Taxi Co.,* 151

Conn. 573, 200 A.2d 712, 714 (1964); *Alldritt v. Kansas Centennial Global Exposition, Inc.,* 189 Kan. 649, 371 P.2d 181, 185–86 (1962); *Johnson v. United States Life Ins. Co.,* 74 N.J.Super. 343, 181 A.2d 380, 382 (App.Div.1962); *Flight Equip. & Eng'g Corp. v. Shelton,* 103 So.2d 615, 623 (Fla.1958); *Solheim v. Hastings Housing Co.,* 151 Neb. 264, 37 N.W.2d 212, 219 (1949); *Higgins v. Bates St. Shirt Co.,* 129 Me. 6, 149 A. 147, 148

Other jurisdictions have taken the contrary view by adopting the Revised Model Business Corporations Act. Section 1.40(8) of that act defines "employee" to "include[ ] officers but not directors." *Accord* Model Business Corp. Act § 2(*o*). As a matter of policy, however, this definition was inserted in order to "ensure that an employee who is also an officer may be lent money by the corporation" under another section of the act. 18B Am.Jur.2d *Corporations* § 1343 (1991). *See* Revised Model Business Corp. Act § 1.40 commentary at 80. According to Fletcher, eighteen states have adopted this definition as part of the act as a whole.[26] 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 n. 9 (perm. ed. rev. vol. 1990). Delaware is not among them, likely because the General Corporation Law already contains a provision allowing loans to both officers and employees. *See* Del.Code tit. 8 § 143 (1991) ("[a]ny corporation my lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation ... whenever, in the judgment of the directors, such loan ... may reasonably be expected to benefit the corporation").[27] Thus, while the fact these jurisdictions have adopted a contrary view must be considered, the Court does "not find them dispositive, helpful, or even particularly predictive of the issue." *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1047 (3d Cir.), *cert. denied sub nom. Upp v. Mellon Bank, N.A.,* —— U.S. ——, 114 S.Ct. 440, 126 L.Ed.2d 373 (1993).

Delaware courts have cited with approval various secondary authorities which agree that corporate officers are not, as a matter of law, employees. *See, e.g., Goldman,* 208 A.2d at 493–94 (citations to follow). American Jurisprudence notes that "[a]n office is usually created by the charter or bylaws of the corporation, while an agency or employment is usually created by the officers." 18B Am.Jur.2d *Corporations* § 1342 (1991). Therefore, "[a]lthough an officer of the corporation has been regarded as not merely by virtue of his office its employee, any officer of a corporation may serve in the capacity of an employee of the corporation." *Id.* (citations omitted). Similarly, Fletcher's Cyclopedia of the Law of Private Corporations states that "while a person may be an officer of an employee of a corporation or both, that person is not as a matter of law an employee because he or she is an officer." 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 (perm. ed. rev. vol. 1990).[28] *See also* Ernest L. Folk et al., *Delaware General Corporation Law* § 142.5 (3d ed. 1992) ("[i]n the absence of an employment agreement for a term, officers have no vested right to their office and serve at the pleasure of the body empowered to replace or remove them").

■ These authorities also agree that the criteria for determining whether an officer is also an employee are "the incidents of the relationship as they actually exist."[29] 18B

---

(1930); *Donaldson v. William H.B. Donaldson Co.,* 176 Minn. 422, 223 N.W. 772, 773 (1929); *Leigh Aitchison, Inc. v. Industrial Comm'n,* 188 Wis. 218, 205 N.W. 806 (1925); *Clark v. New England Tel. & Tel. Co.,* 231 Mass. 546, 121 N.E. 497, 498 (1919); *Bullock Beresford Mfg. Co. v. Hedges,* 76 Ohio St. 91, 81 N.E. 171, 172 (1907); *Vardeman v. Penn Mut. Life Ins. Co.,* 125 Ga. 117, 54 S.E. 66, 67 (1906).

**26.** Those states are Alabama, Arizona, Arkansas, Colorado, Georgia, Hawaii, Indiana, Kentucky, Mississippi, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, and Wyoming. 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 n. 9 (perm. ed. rev. vol. 1990).

**27.** Plaintiff has brought to the Court's attention the language "officer or other employee" in this

section to support its argument that all officers are employees. Even were this language to support plaintiff's argument, it is the only such reference in the General Corporation Law. *See, e.g.,* Del.Code tit. 8 § 145 ("[a] corporation may indemnify any person who was or is a party ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation...."").

**28.** Fletcher also notes the contrary provision of the Revised Model Business Corp. Act and the rationale behind that provision. *See supra* at 571.

**29.** Another secondary authority lists as its criteria "the character of duties performed, and the salary received." 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 (perm. ed. rev. vol. 1990) (citations omitted). Both duties and salary are indeed proba-

Am.Jur.2d *Corporations* § 1342 (1991). *Accord* 19 C.J.S. *Corporations* § 468 (1990). *See also Shriver v. Carlin & Fulton Co.*, 155 Md. 51, 141 A. 434, 438 (1928) (whether "the duties and incidents of his employment are separate and distinct from those pertaining to his office"). An evaluation of the incidents of a potential employment relationship necessarily involves questions of fact. *See* 2 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 266 (perm. ed. rev. vol. 1990).

■ Based upon the foregoing, the Court predicts the Delaware Supreme Court would hold that a corporate officer is not, as a matter of law, also a corporate employee merely by virtue of his office. Instead, the Court predicts the Delaware Supreme Court would hold that whether a corporate officer is also an employee depends on the incidents of his or her relationship to the corporation. The Court has already discussed that there is a genuine dispute of material fact as to the incidents of Robert Haft's relationship with Crown. Clearly, then, there remains a genuine issue precluding the Court from granting summary judgment to Robert Haft on whether he was employed by Crown until June 30, 1993, the date he claims to have been terminated. Thus, there is a genuine issue of material fact as to whether Robert Haft "voluntarily terminate[d] employment" with Crown.

### 3. Abandonment of Employment

■ Defendant contends that even if it did have an employment relationship with plaintiff, as a matter of law, plaintiff abandoned his employment in one of two ways: first, by hiring Hemmerle to replace him as President and Chief Executive Officer; or second, by breaching the Employment Agreement thereafter "so fundamental[ly] as to be tantamount to an abandonment of any employment relationship." D.I. 14 at 23.

■ Generally, "a contract remains in force until and unless it has been terminated according to its terms or by actions of the parties." *Artesian Water Co. v. State Dep't of Highways & Transp.*, 330 A.2d 441, 443 (Del.1974) (citing 17A C.J.S. *Contracts* § 385(1) (1963)). Abandonment, however, may constitute one of those actions. Abandonment is defined as "the voluntary relinquishment of all right, title, claim and possession, with the intention of not reclaiming it." Black's Law Dictionary 13 (4th ed. 1957). In the context of a contractual employment relationship, abandonment occurs when there is "a complete and total failure on [one's] part to perform [one's] obligations ..." *Moran v. Edson*, 493 F.2d 400, 405 (3d Cir.1974) (citing cases of various jurisdictions). *See also Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch.1958) ("[a]n outright refusal of one party to a contract to perform the contract or its essentials constitutes such a repudiation as to entitle the other contracting party to treat the contract as rescinded"). The determination whether such a failure constitutes abandonment depends on "concurrence of the intention to abandon manifested by some overt act or failure to act which carries the implication that the owner neither claims nor retains any interest." *State v. Bailey*, 97 N.J.Super. 396, 235 A.2d 214, 216 (App.Div.1967). There can be no bright line rule governing whether an employee has abandoned his employment. Instead, "[e]ach case must be considered on its own facts." *MacWilliams v. Bright*, 273 Md. 632, 331 A.2d 303, 306 (1975) (citing cases of various jurisdictions).

In addition to the circumstances surrounding Robert Haft's hiring of Hemmerle on behalf of Crown, defendant highlights circumstances surrounding Robert Haft's work habits which establish a genuine issue of material fact as to whether Robert Haft abandoned his employment with Crown. Hemmerle states Robert Haft "would visit Crown's office irregularly, sometimes visiting once or twice a week and then only for a few hours." D.I. 15 Ex. 3 at ¶ 9. DeFeo and Alegret, during their tenure as supporting secretaries of Robert Haft, have similar rec-

---

tive of any employment relationship which may have existed between plaintiff and defendant at the time plaintiff claims he was fired. The Court therefore finds no disunity between these criteria and those contained in the phrase "the incidents of the relationship as they actually exist." Both emphasize that "the manner of designating the person in question ... is not at all conclusive of the question" whether that person was indeed employed. *Id.*

ollections. D.I. 15 Ex. 4 at ¶ 1–2, Ex. 5 at ¶ 1–2. Defeo further recalls that, over time, her workload came to consist mainly of Robert Haft's personal matters. D.I. 15 Ex. 4 at ¶ 2.

In addition, Herbert Haft recites several instances of alleged malfeasance which, construed in favor of defendant, further establish a genuine issue as to abandonment, including: (1) Robert Haft's refusal to call the annual shareholders meeting and distribute the necessary proxy materials; (2) his "efforts to utilize [his] positions at Crown for [his] personal ends"; (3) his "conversion of company property to [his] own use", including the removal and destruction of company property; and (4) "a wide array of conduct destructive and obstructive of the business objectives of the company." D.I. 11 Ex. Q at 2; D.I. 15 Ex. 2–D at 2. Making no determination as to the credibility of either party, the Court holds a factfinder could infer from these facts that Robert Haft intended to, and did, abandon his employment with Crown. Summary judgment therefore must be denied plaintiff on this issue.

In sum, the Court holds there is a genuine issue of material fact concerning whether plaintiff "voluntarily terminated employment" with defendant. Summary judgment for plaintiff on that issue therefore is improper. The Court will proceed to consider the affirmative defenses advanced by defendant: first, whether there was valid consideration for the shares issued to plaintiff; and second, whether plaintiff comes before the court with "unclean hands." D.I. 14 at 28–31.

## D. Affirmative Defenses

### 1. Adequacy of Consideration for the Issuance of Plaintiff's Shares

 Defendant asserts as a defense that any consideration supporting the issuance of plaintiff's shares was, as a matter of law, "inadequate and invalid." D.I. 13 at 27 (answer and counterclaims). It is a fundamental tenet of contract law that a valid contract requires good or valuable consideration.[30] *Affiliated Enterprises, Inc. v. Waller,* 5 A.2d 257, 259 (Del.Super.Ct.1939). *See* 17A Am.Jur.2d *Contracts* § 117 (1991). Delaware courts define consideration, in general, as that which is given to induce a promise or performance in return. *Affiliated Enterprises,* 5 A.2d at 259. *See* Restatement (Second) of Contracts §§ 71(1), 71(2) (1981). Consideration can consist of either a benefit to the promisor or a detriment to the promisee. *First Mortgage Co. v. Federal Leasing Corp.,* 456 A.2d 794, 795–96 (Del.1982).

 Specifically in the context of contracts to issue stock, Article IX of the Delaware Constitution requires certain types of consideration: "[n]o corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation." [31] Del. Const. Art. IX, § 3. *See also* Del.Code tit. 8 § 152 (1991) ("[t]he capital stock so issued shall be deemed to be fully paid and nonassessable stock, if: (1) [t]he entire amount of such consideration has been received by the corporation in the form of cash, services rendered, personal property,

**30.** There is a distinction between lack of consideration and failure of consideration. *Hensel v. U.S. Electronics Corp.,* 262 A.2d 648, 651 (Del. 1970). When consideration is lacking, there was never a contract at all. *Id.* On the other hand, when consideration has failed, there was a contract but it has now become unenforceable because "some supervening cause has made performance impossible." *Id.* (citing 1 Samuel Williston, *Williston on Contracts* § 119A (3d ed. 1959)).

Lack of consideration is a good defense to the enforcement of a contract unless that contract is under seal. *Id.* Failure of consideration, however, is always a good defense to the enforcement of a contract, sealed or not. *Id.* In this case, the

defense is properly categorized as the former—"lack of consideration"—because defendant bases its arguments on the issuance of shares in exchange for an unsecured promissory note. D.I. 14 at 28. Because the contract at issue was not under seal, defendant is free to assert the defense of lack of consideration.

**31.** Stock issued for insufficient consideration is not void, but voidable, for a "court of equity may declare the unlawful subscription contract to be ineffective … if for any reason it be equitable and just to do so" under the facts of the case. *Scully v. Automobile Finance Co.,* 109 A. 49, 53 (Del.Ch.1919).

real property, leases of real property or a combination thereof....").[32]

■ The critical time for determining whether lawful consideration exists is the date the shares were actually issued. *Highlights for Children, Inc. v. Crown*, 227 A.2d 118, 121 (Del.Ch.1966). In this case, defendant issued the restricted shares to plaintiff on August 30, 1989, the date on which the parties signed the Incentive Stock Agreement. *See* D.I. 15 Ex. 1–C at 1–2 (providing "[t]he Corporation hereby transfers and conveys the Shares ...). Plaintiff first contends that, as of that date, there was valid consideration flowing to defendant in the form of past services performed by plaintiff. D.I. 17 at 15–16. In the alternative, plaintiff maintains that as of the future date on which unrestricted shares would be issued, plaintiff will tender valid consideration in the form of cash. *Id.* at 16–17. Finally, plaintiff asserts that even if any shares were—or will be—issued for inadequate consideration, defendant has acquiesced in any insufficiency of consideration.[33] *Id.* at 17–18. By contrast, defendant highlights the tender of an unsecured promissory note as the sole form of consideration flowing to defendant. D.I. 14 at 28.

### a. The Unsecured Promissory Note

■ The Incentive Stock Agreement provides that "[t]he Corporation hereby acknowledges payment by Haft of the sum of $203,750, in the form of a non-interest bearing promissory note due January 2, 2004 ... in full payment of the Shares." D.I. 15 Ex. 1–C at 1–2. Defendant notes that, in Delaware, "a promissory note, being a mere unsecured promise to pay, is not property actually acquired by the corporation" and thus not valid consideration.[34] *Highlights for Children, Inc. v. Crown*, 227 A.2d 118, 120 (Del. Ch.1966) (citing *Sohland v. Baker*, 141 A. 277 (Del.1927)). *See also Lofland v. Cahall*, 118 A. 1, 6 (Del.1922) ("[a] promise to pay money does not meet the constitutional requirement"). That plaintiff tendered such a note, however, does not end the inquiry. Plaintiff alleges other, potentially valid forms of consideration which may be sufficient to support the stock issuance by themselves.[35] If so, Crown was free to require the tender of Robert Haft's unsecured promissory note, for "[w]hen the legal standard of consideration for stock, its quality and amount, is satisfied, the corporation is at liberty to insist on any additional terms by way of contract it may choose, whether such additional terms will furnish what in the first instance would be a lawful consideration or not." *Riegel v. The Only Package Pie, Inc.*, 128 A. 110, 112 (Del.Ch.1925). The question becomes, then, whether plaintiff's past services can constitute valid consideration for the issuance of his shares under the agreement.

---

**32.** Of course, a corporation may issue partially paid shares which are subject to assessment. The General Corporation Law provides that "[a]ny corporation may issue ... shares as partly paid and subject to call for the remainder of the consideration to be paid therefor [so long as] [u]pon the face or back of each stock certificate issued to represent any such partly paid shares, ... the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated." Del.Code tit. 8 § 156 (1991). No party has introduced evidence suggesting that defendant issued plaintiff partially paid shares under the agreement. Instead, plaintiff was issued fully paid shares encumbered by a restriction upon their transfer, and defendant contests the adequacy of the consideration for those shares. That the shares were fully paid, in part, by an unsecured promissory note does not change the analysis.

**33.** Because it finds valid consideration, the Court does not reach this argument.

**34.** Interestingly enough, one commentator has said that "[t]he proscription against the use of a promissory note as consideration for the payment of stock would no longer seem to prevent issuance of shares ... as an incentive to performance" after the enactment of Del.Code tit. 8 § 143 (1991). R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.9 at 5–36 (Supp. 1993). The Court need not decide this issue.

**35.** Defendant urges the language "[t]he Corporation hereby acknowledges payment by Haft of the sum of $203,750 *in full payment of the Shares*" indicates there could be no other form of consideration given for the issuance of shares. D.I. 15 Ex. 1–C at 1–2 (emphasis added). The Court disagrees. Defendant places too great an emphasis on six words, and too little an emphasis on the recitals, and indeed the agreement, as a whole.

### b. Past Services as "Labor Done"

A corporation, of course, may compensate its officers and agents for services rendered. Del.Code tit. 8 § 122(5) (1991). Such compensation may include stock option, stock incentive, and other compensation plans. Del.Code tit. 8 § 122(15) (1991). In addition, the General Corporation Law confers broad discretion upon a corporation, through its directors, when it contracts to issue stock, stock options, and other rights in stock. Del. Code tit. 8 §§ 152, 157 (1991). Most significantly, "[i]n the absence of actual fraud in the transaction, the judgment of the directors as to the value of such consideration shall be conclusive." Del.Code tit. 8 § 152 (1991) (pertaining to issuance of stock). The Delaware Supreme Court has held, however, that "[i]mplicit in [the analogous Del.Code tit. 8 § 157] is the existence of some consideration ..." *Michelson v. Duncan,* 407 A.2d 211, 224 (Del.1979).[36]

The Incentive Stock Agreement provides for the issuance of shares "in recognition of Robert M. Haft's contribution to the Corporation ...", in other words, in recognition of his past services rendered.[37] D.I. 15 Ex. 1–C at 1. Past services constitute valid consideration as "labor done." Del. Const. Art. IX, § 3; Del.Code tit. 8 § 152 (1991). As the Delaware Chancery Court has held, both "constitution and statute prohibit corporations organized under the general law from issuing stock 'except for money paid, labor done or personal property or real estate or leases thereof actually acquired.' If stock is issued and fully paid for by property of any of these kinds, the lawful requirement is satisfied." [38] *Riegel v. The Only Package Pie, Inc.,* 128 A. 110, 112 (Del.Ch.1925). *See also Scully v. Automobile Finance Co.,* 109 A. 49, 51 (Del.Ch.1919) (holding fully paid shares "can be issued only for 'labor done,' i.e., after it has been done").

Plaintiff had performed some services for defendant prior to the issuance of his shares. Because this consideration exists, the judgment of defendant's directors as to its value is conclusive in the absence of actual fraud. Del.Code tit. 8 § 152 (1991). One commentator has noted "the requirement of 'actual fraud' as a prerequisite to upsetting the judgment of the directors as to the value of the consideration received in exchange for the issuance of stock does not ... protect the directors in all instances from a gross overvaluation." R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.9 at 5–34 (Supp.1993). In order to establish actual fraud, however, defendant must make two showings: first, defendant must offer evidence of "gross overvaluation," which would establish constructive fraud; and second, defendant must allege other facts which, considered in connection with the "gross overvaluation," may be grounds for inferring actual fraud. *Diamond State Brewery, Inc. v. De La Rigaudiere,* 17 A.2d 313, 316–17 (Del.Ch.1941). "[A] showing of no more than excessive valuation is insufficient to overcome the conclusiveness of the directors' judgment." *Id.* at 316. *See also Lewis v. Scotten Dillon Co.,* 306 A.2d 755, 757 (Del. Ch.1973) ("excessive valuation, standing alone, is not enough unless it is so gross as to lead the Court to conclude that it was due, not to an honest error of judgment but to bad faith or a reckless indifference to the rights of others").

---

**36.** Most likely the same is true of the analogous language of Del.Code tit. 8 § 152, relating to the issuance of stock, although no court has addressed the question. The Court does not address the question because its resolution would not change the result in this case.

**37.** Defendant argues that because this language appears in a recital, it is to be given no weight. Contract recitals are not necessary terms to a contract, and "if [recitals are] inconsistent with clear and definite language in the granting part [of the contract] the latter will prevail." *Stabler v. Ramsay,* 62 A.2d 464, 470 (Del.Ch.1948), *mod-* *ified on other grounds,* 88 A.2d 546 (Del.1952). The Court has already held, however, that the contract is plain and its provisions wholly consistent. The Court may therefore refer to the recitals of the Incentive Stock Agreement. *Id. Cf. Ringling v. Ringling Bros.–Barnum & Bailey Combined Shows, Inc.,* 49 A.2d 603, 610 (Del.Ch. 1946), *modified on other grounds,* 53 A.2d 441 (Del.1947) (holding the same for contractual nomenclature).

**38.** For the text of those constitutional and statutory provisions, *see supra* at 573.

Defendant, asserting the defense of lack of consideration, bears the burden of proving that defense. *Belle Isle Corp. v. MacBean,* 61 A.2d 699, 704 (Del.Ch.1948). Despite that fact, defendant has neither pleaded facts nor placed any evidence in the record which would suggest actual fraud in the formation of the Incentive Stock Agreement. *See* D.I. 32 at 48–49 (transcript of hearing). As defendant has failed to demonstrate the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment on the applicability of this defense must therefore be granted plaintiff.[39] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### c. Cash as "Money Paid"

In the alternative, plaintiff argues the adequacy of consideration must be evaluated as of the future date upon which defendant would be ordered to reissue unrestricted shares to plaintiff. In other words, plaintiff asserts that "[s]ince the unrestricted stock shares have not been issued *at all,* they cannot be deemed to have been issued for no consideration." D.I. 17 at 16 (emphasis in original). Upon the issuance of unrestricted shares, plaintiff argues, he stands ready to pay for the shares with cash, which constitutes valid consideration as "money paid" under Article IX of the Delaware Constitution. D.I. 17 at 16–17. The Court, while finding the restricted shares initially were issued for valid consideration in the form of "labor done," alternatively finds that any unrestricted shares to be issued in future will be issued for valid consideration in cash representing the amount specified in the agreement. Again, summary judgment must be granted plaintiff on this issue.

### 2. Plaintiff's Unclean Hands

Finally, defendant also asserts the equitable defense [40] of "unclean hands," alleging that as a matter of law, plaintiff has taken certain actions which should foreclose his right to the equitable remedy of specific performance. The defense centers around the equitable maxim that "he who comes into equity must come with clean hands" and keep them clean throughout the litigation. *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). The maxim is imposed by courts themselves to close their doors to those tainted with inequity. *Precision Instrument Mfg. Co.,* 324 U.S. at 814, 65 S.Ct. at 997. It is applied regardless of the behavior of the defendant, because courts will simply not be "the abettor[s] of iniquity." *Id.* Thus, if the hands of a plaintiff are found to be unclean, "he must be denied all relief whatever may have been the merits of his claim." [41] *Gaudiosi,* 269 F.2d at 882 (citation omitted).

Courts have emphasized that the "unclean hands" defense is a narrow one. *See General Dev. Corp. v. Binstein,* 743 F.Supp. 1115, 1134 (D.N.J.1990). That is, because the maxim is equitable, it applies to bar only equitable relief. *Id.* But see *Tarasi v. Pittsburgh Nat'l Bank,* 555 F.2d 1152 (3d Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977) (discussing legal defense of "in pari delicto"). Further, the defense applies only to conduct which is immediately related to the present dispute. Unrelated conduct will not establish "unclean hands." *DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1146 n. 10 (3d Cir.1980). Thus, while " 'equity does not demand that its suitors shall have led blameless lives' as to

---

**39.** It is well settled that one legally sufficient consideration is enough to support a contract. *See Hensel v. U.S. Electronics Corp.,* 251 A.2d 828, 833 (Del.Super.Ct.1969), *rev'd on other grounds,* 262 A.2d 648 (Del.1970) (citations to secondary authorities omitted).

**40.** The equitable doctrine commonly known as "unclean hands" is not really a defense at all. *Sears, Roebuck & Co. v. Sears,* 744 F.Supp. 1297, 1309 (D.Del.1990). Courts apply the doctrine

"for their own protection and not as a matter of 'defense' to the defendant." *Gaudiosi v. Mellon,* 269 F.2d 873, 882 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).

**41.** This equitable maxim similarly applies in Delaware. *See Collins v. Burke,* 418 A.2d 999 (Del. 1980); *Walter v. Walter,* 136 A.2d 202 (Del.1957). The Court, however, will apply federal law because defendant alleges plaintiff brings inequity into a federal district court.

other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Co.,* 324 U.S. at 814–15, 65 S.Ct. at 997 (quoting *Loughran v. Loughran,* 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219 (1934)).

Courts have wide discretion in refusing to aid unclean parties, and are not bound by any formula which would limit that discretion. *Precision Co.,* 324 U.S. at 815, 65 S.Ct. at 997–98. The United States Supreme Court, however, has provided a guiding principle: that "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim." *Id.* In other words, relief will be denied a party "who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge." *Gaudiosi,* 269 F.2d at 882. The Third Circuit Court of Appeals has set out more specific guidelines. The conduct must suggest "fraud, unconscionability, or bad faith" on the part of the plaintiff. *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 377 n. 7 (3d Cir.1992). *Accord Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1354 (3d Cir.), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) (conduct must be "unconscionable"); *Castle v. Cohen,* 840 F.2d 173, 178 (3d Cir.1988) (conduct must be in "bad faith").

Summary judgment is rarely proper in cases raising the defense of "unclean hands" because "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles." *DeLong Corp.,* 622 F.2d at 1146. This is particularly true when, as here, the parties allege fundamentally conflicting facts. Important for the purposes of this motion are the facts which defendant alleges, because the Court must make all inferences in favor of defendant. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976),

*cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

In support of its "unclean hands" defense, defendant highlights certain testimony by Herbert Haft[42] concerning: (1) Robert Haft's refusal to call the annual shareholders meeting and distribute the necessary proxy materials; (2) his "efforts to utilize [his] positions at Crown for [his] personal ends"; (3) his "conversion of company property to [his] own use", including the removal and destruction of company property; and (4) "a wide array of conduct destructive and obstructive of the business objectives of the company." D.I. 11 Ex. Q at 2; D.I. 15 Ex. 2–D at 2. In addition, Herbert Haft places particular emphasis on Robert Haft's remarks to various media which, in his estimation, caused "significant injury to the companies." D.I. 15 Ex. 2 at ¶ 2. When Herbert Haft requested Robert Haft to cease all such communications, Herbert Haft recalls that "in disregard of [his] express instructions, Robert Haft, through a public relations firm, continued to comment to the press about the business of Dart, Crown, and the other related entities." *Id.* at ¶ 4. All of these facts are part of what defendant urges was a disloyal "campaign to gain control of Dart." D.I. 14 at 9. Clearly, then, the determination whether plaintiff brings "unclean hands" into the controversy depends on the resolution of these and other factual issues relating to his subjective intentions. Because there is a genuine issue of material fact present, summary judgment must be denied plaintiff on the applicability of the equitable maxim to this case.

## IV. CONCLUSION

Making all inferences in favor of defendant, the Court finds there are genuine issues of material fact present with respect to (1) whether plaintiff is entitled to the new issuance of unrestricted shares pursuant to the Incentive Stock Agreement; and (2) whether plaintiff, seeking to specifically enforce that agreement, comes before the Court with "unclean hands." The Court finds, however, no genuine issues of material

---

42. Defendant also highlights these facts in support of its argument that plaintiff abandoned any employment he may have had with defendant.

The legal standards, of course, differ as between abandonment of an employment relationship and "unclean hands."

578

fact to be present with respect to whether plaintiff's restricted shares were issued for valid consideration. Therefore, plaintiff's motion for partial summary judgment will be granted in part and denied in part.

An appropriate order will issue.